Filed 12/18/25  P. v. Motsenbocker CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D084913 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD241912) |
| MATTHEW MOTSENBOCKER, | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge.  Affirmed.

Daniel J. Kessler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, Robin Urbanski and Brendon Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

In 2013, Matthew Motsenbocker was found guilty of multiple crimes related to his attempt to evade a federal marshal who was seeking to arrest him. Motsenbocker was originally sentenced to 29 years four months in prison but was later resentenced to a term of 19 years four months.

In 2024, the Secretary of the California Department of Corrections and Rehabilitation ("CDCR") recommended additional resentencing pursuant to Penal Code[1] section 1172.1, subdivision (a)(1) based on Motsenbocker's "exceptional conduct" while incarcerated, which included his demonstrated commitment to rehabilitation. After the People filed an opposition to the recommendation and Motsenbocker filed a brief in support, the trial court held a hearing and declined to recall Motsenbocker's sentence. On appeal, Motsenbocker claims the trial court abused its discretion in refusing to recall his sentence and resentence him.

We affirm the order.

FACTUAL BACKGROUND[2]

On July 6, 2012, Nicholas Wayman, a bail enforcement agent, requested the assistance of Deputy U.S. Marshal Don Allie to apprehend Motsenbocker, a fugitive with an outstanding felony warrant for his arrest. Allie and Deputy U.S. Marshal Kristopher Stephens met Wayman at an

---

[1] Unless otherwise specified, all subsequent statutory references are to the Penal Code.

[2] We, sua sponte, take judicial notice of our prior opinion in Motsenbocker's direct appeal (*People v. Motsenbocker* (Nov. 4, 2015, D064877) [nonpub. opn.], review granted Jan. 20, 2016, S231177, review dismissed February 22, 2017). (See Evid. Code, §§ 452, subd. (d), 459.) As do the parties in their briefing, we rely on that prior opinion in providing a factual background.

2

apartment complex where Lindsey Hagberg, Motsenbocker's girlfriend, resided. They saw Hagberg drive away in a white Volvo.

Marshal Allie, driving an undercover black Dodge Durango; Marshal Stephens, driving an undercover black Dodge Charger; and Wayman, driving a white Kia Optima, followed Hagberg to a shopping center on Balboa Avenue. Hagberg stopped and spoke with Motsenbocker, who was standing next to a stolen Toyota FJ Cruiser. He got in the stolen vehicle, drove to a nearby cul-de-sac, and parked it there. Hagberg, who followed Motsenbocker to the cul-de-sac, then picked him up in her Volvo.

While Motsenbocker and Hagberg were in the cul-de-sac, Allie and Stephens put on their body armor vests, which identified them as "U.S. Marshals." Both Allie and Stephens also displayed U.S. Marshal badges on their apparel. Allie, Stephens, and Wayman followed Hagberg as her Volvo left the cul-de-sac. Wayman could not identify the vehicle's passenger because the passenger seat was tilted back low. Allie saw movement in the passenger's seat.

Based on his observations, Marshal Allie decided to initiate a traffic stop of the Volvo and activated his vehicle's emergency lights and siren. Marshal Stephens also activated his vehicle's emergency lights, but not his siren because he was attempting to communicate on his radio. Both vehicles' emergency lights were red and blue lights located at the top of the front windshield. Their vehicles also had "wigwag" lights in their front headlights that flash in a strobe-like fashion. Wayman heard the siren and saw the flashing lights.

Despite the flashing lights and siren, Hagberg did not stop her vehicle. She knew Motsenbocker had outstanding arrest warrants and thought law enforcement agents were following her in the Dodge Durango. She continued

3

driving from southbound Interstate 805 onto Balboa Avenue, pulled behind a flatbed semi-truck, and maneuvered between that truck and Marshal Allie's Durango to the front of the lighted intersection. With his vehicle's lights and siren still activated, Allie drove his vehicle forward to see the driver's side of the Volvo.

Hagberg told Motsenbocker she wanted to get out of her vehicle. She jumped out, walked toward Marshal Allie with her hands up in the air, and complied with Allie's command to lie on the ground.

Marshal Allie approached the Volvo and saw Motsenbocker move from the front passenger's seat to the driver's seat. Allie ordered Motsenbocker to get out of the vehicle, but he did not comply. Allie reached through the Volvo's open driver's window with his left hand (without his gun drawn) in an attempt to grab the keys and disable it, but Motsenbocker sped off with Allie hanging onto the driver's side of the vehicle.

As Motsenbocker accelerated through the traffic light, traveling about 25 miles per hour, Marshal Stephens heard a pop and saw Marshal Allie "go flying across the road." Allie fell onto the street and rolled into the center median.

Motsenbocker continued driving, crossing the center median, heading into oncoming traffic and then crossing back over into westbound traffic, where he then stopped the Volvo. He got out of the Volvo and yelled, "Help me, I've been shot." Marshal Stephens arrested Motsenbocker.

Wayman came to Marshal Allie's aid, saw Allie's firearm on the road, and secured it. Allie appeared unresponsive, had a gash on his head, and was bleeding. Allie was taken to a hospital, where he was diagnosed with an acute intracranial hemorrhage with subdural hematomas, a subarachnoid

4

hemorrhage, a neck strain, scalp lacerations, facial abrasions, bilateral upper extremity abrasions, and a potential loss of consciousness.

Toxicology tests showed Motsenbocker had ingested methamphetamine within 24 hours of his arrest. He also had morphine and codeine in his system, which was indicative of heroin use. After the incident, Motsenbocker told paramedics he had used heroin two hours earlier.

Marshal Stephens found a stolen Glock handgun, apparently loaded, on the passenger's seat of the Volvo. Officers found the case for that handgun in the stolen FJ Cruiser Motsenbocker had been driving. His DNA profile matched that found on the handgun. Officers also found two knives on the floorboard of the driver's seat of the Volvo.

PROCEDURAL BACKGROUND

In 2013, a jury found Motsenbocker guilty of the following 13 offenses: assault with a deadly weapon (§ 245, subd. (a)(1)); two counts of felon in possession of a firearm (§ 29800, subd. (a)(1)); auto theft (Veh. Code, § 10851, subd. (a)); two counts of receiving stolen property (§ 496, subd. (a)); two counts of burglary (§ 459); felon in possession of ammunition (§ 30305, subd. (a)(1)); possession of a forged document (§ 475, subd. (a)); possession of a completed check with intent to defraud (§ 475, subd. (c)); unlawful possession of an access card (§ 484e, subd. (c)); and petty theft with priors (§§ 484, 666). With respect to the assault with a deadly weapon count, the jury found true the allegation that Motsenbocker had inflicted great bodily injury on the victim (§ 12022.7). The jury further found that Motsenbocker was on bail when the offenses took place (§ 12022.1, subd. (b)). Motsenbocker admitted

5

having suffered both a prior strike conviction and a serious felony conviction, as well as having served a term in prison.

The trial court originally sentenced Motsenbocker to 29 years four months in prison. We modified the judgment by striking a stayed prison prior enhancement, and otherwise affirmed the judgment. (*People v. Motsenbocker, supra*, D064877.)

In 2016, Motsenbocker filed a petition for writ of habeas corpus. During an evidentiary hearing on that petition, pursuant to the parties' stipulation, the trial court resentenced Motsenbocker to a term of 19 years four months. The sentence was comprised of 11 years on the assault with a deadly weapon count and related great bodily injury enhancement, a consecutive term of three years four months on one of the felon in possession counts and the related bail enhancement, and a consecutive term of five years for the serious felony enhancement finding. On the People's motion, the court dismissed the remaining counts and special allegations.

In 2024, the Secretary of the CDCR sent a letter to the trial court recommending that Motsenbocker's sentence be recalled and that he be resentenced pursuant to section 1172.1, subdivision (a)(1) based on his exceptional conduct in prison. As detailed below, after briefing and argument, the trial court declined to recall Motsenbocker's sentence.

Motsenbocker appeals from the court's order denying the Secretary's recommendation to recall.

DISCUSSION

Motsenbocker claims the trial court erred in refusing to recall his sentence and resentence him pursuant to section 1172.1.

1. *Governing law and standard of review*

"Section 1172.1 provides a recall and resentencing procedure that may be invoked when, for example, the Secretary of the Department of Corrections and Rehabilitation recommends resentencing." (*People v. Dain* (2025) 115 Cal.App.5th 235, 248.) "The Department makes such recommendations 'not only to bring to the trial court's attention sentences in need of correction (e.g., unauthorized sentences) but also to invite the court to recall sentences based upon equitable considerations . . . .' [Citation.] The 'recommendation furnishes the court with jurisdiction it would not otherwise have to recall and resentence and is "an invitation to the court to exercise its equitable jurisdiction." ' " (*People v. Codinha* (2023) 92 Cal.App.5th 976, 986–987.)

Section 1172.1, subdivision (a)(1) provides in relevant part: "When a defendant, upon conviction for a felony offense, has been committed to the custody of the Secretary of the Department of Corrections and Rehabilitation . . ., the court may, . . . at any time upon the recommendation of the secretary . . ., recall the sentence and commitment previously ordered and resentence the defendant in the same manner as if they had not previously been sentenced, whether or not the defendant is still in custody, and provided the new sentence, if any, is no greater than the initial sentence."

Section 1172.1, subdivision (a)(5) specifies a series of factors that a court shall consider in recalling and resentencing a defendant and provides in relevant part: "In recalling and resentencing pursuant to this provision,

7

the court shall consider postconviction factors, including, but not limited to, the disciplinary record and record of rehabilitation of the defendant while incarcerated, evidence that reflects whether age, time served, and diminished physical condition, if any, have reduced the defendant's risk for future violence, and evidence that reflects that circumstances have changed since the original sentencing so that continued incarceration is no longer in the interest of justice. Evidence that the defendant's incarceration is no longer in the interest of justice includes, but is not limited to, evidence that the defendant's constitutional rights were violated in the proceedings related to the conviction or sentence at issue, and any other evidence that undermines the integrity of the underlying conviction or sentence. The court shall consider if the defendant has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence, . . . and whether those circumstances were a contributing factor in the commission of the offense."

Section 1172.1., subdivision (b) provides that if the Secretary of the CDCR makes a request for resentencing under the statute, "There shall be a presumption favoring recall and resentencing of the defendant, which may only be overcome if a court finds the defendant currently poses an unreasonable risk of danger to public safety, as defined in subdivision (c) of Section 1170.18." (§ 1172.1, subd. (b)(2).)

Section 1170.18, subdivision (c) in turn defines an "unreasonable risk of danger to public safety" to mean "an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." Violent felonies that fall within this meaning are "commonly referred to as super strikes." (*People v. Valencia* (2017) 3 Cal.5th 347, 351, fn. 3.) Included

8

within this list is "[a]ny homicide offense, including any attempted homicide offense." (§ 667, subd. (e)(2)(C)(iv).)

The parties agree that this court reviews a trial court's decision whether to recall and resentence a defendant under section 1172.1 for an abuse of discretion. Accordingly, we apply the abuse of discretion standard. (See *People v. Frazier* (2020) 55 Cal.App.5th 858, 863 [applying section 1172.1's predecessor statute and stating, "We review the court's order declining to follow the Secretary's recommendation for abuse of discretion."].) "Under this standard, a trial court's exercise of discretion will not be disturbed unless the trial court exercised it in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Gibson* (2016) 2 Cal.App.5th 315, 325 (*Gibson*).)

2. *Additional background*

In June 2024, the Secretary filed a letter to "provide the court with the authority to resentence [Motsenbocker] pursuant to . . . [s]ection 1172.1, [s]ubdivision (a)(l) based on exceptional conduct while incarcerated." The Secretary explained, "Motsenbocker has not only exhibited exceptional conduct through their ability to obey rules and regulations but has also demonstrated a commitment to their rehabilitation through voluntary participation in various self-help programs, and vocational and educational programs," and had "displayed dedicated participation in their rehabilitation."

The People filed an opposition to the Secretary's recommendation. The People discussed Motsenbocker's "violent actions in this case," as well as his serious prior criminal history involving firearms, drugs, and residential burglary. The People also referred to Motsenbocker's initial behavior while in prison, which included his use of weapons and drugs. In particular, the

9

People noted that Motsenbocker's prison disciplinary record involved a rules violation for his use of a "manufactured weapon to stab [another inmate] several times in abdomen."[3] The People also noted that Motsenbocker had a "long history of struggling when released into the community, as seen in his many failures on probation . . . ."[4] Along with their opposition, the People lodged a letter from Marshal Allie's wife and son opposing the resentencing and describing the negative impact that "Motsenbocker's actions had on [their] family."

Motsenbocker filed a brief in support of the Secretary's recommendation that emphasized his exemplary postconviction conduct in prison since 2015. Along with his brief, Motsenbocker lodged the Secretary's letter recommending resentencing, along with an accompanying report outlining relevant information pertaining to the commitment offenses,

---

[3] The People's opposition contains references to several attachments that are not included in the clerk's transcript, including one that appears to describe the circumstances of Motsenbocker's disciplinary history while incarcerated, including the prison stabbing. The clerk's transcript does contain a photocopy of a compact disc entitled "People's Opposition to Resentencing," but the disc has not been transmitted to this court. In addition, at the hearing on the Secretary's recommendation, the court received in evidence an exhibit that the prosecutor stated, "contains the attachments that I submitted to the court attached to my motion in opposition." However, that exhibit is not in the clerk's transcript and has not been transmitted to this court.

Since Motsenbocker has not explained these omissions or challenged the correctness of the People's description of his prison disciplinary history in their trial brief, we rely on the People's characterization of Motsenbocker's prison disciplinary history offered in the People's trial brief.

[4] The record contains the probation report from the commitment offenses. The report states that Motsenbocker had been granted probation three times and that he had not successfully completed probation on any of the grants.

10

Motsenbocker's criminal history, and his behavior while incarcerated. The report includes a list of numerous commendations that Motsenbocker had received for positive behavior in prison as well as a lengthy list detailing Motsenbocker's rehabilitative activities while incarcerated. Motsenbocker also included a letter from a doctor and a nurse indicating that he was participating in a tattoo removal program. He also lodged many letters of support, copies of the numerous detailed commendations from prison staff, and copies of several certificates obtained for various rehabilitative programs. Motsenbocker also lodged letters that he had written to the trial judge, Marshal Allie and the City of San Diego expressing his remorse for his prior actions, as well as both a "Journey Letter" and a "Reentry Plan."

Upon completion of the briefing, the trial court held a hearing on the Secretary's recommendation at which the court heard from both defense counsel and the prosecutor as well as Motsenbocker[5] and his wife.

Defense counsel argued that there was "not enough evidence to support a finding that Mr. Motsenbocker currently poses an unreasonable risk [to] public safety," and that the presumption in favor of resentencing applied. Defense counsel stressed that Motsenbocker had no custodial rule violations over the past ten years, and that he had participated in extensive rehabilitative programming. Counsel noted that the defense had provided ten letters from CDCR staff who had exhaustively described the "immense change that [Motsenbocker] has made in his life." Counsel also noted that Motsenbocker was deeply remorseful and that he had written a statement of remorse to the affected parties. In addition, counsel noted that the record contained letters of support from other inmates, as well as from family and friends. Further, counsel observed that Motsenbocker had provided the court

---

[5]     Motsenbocker appeared via video feed from prison.

11

with a detailed reentry plan addressing future plans for obtaining housing, employment and transitional support, which counsel summarized at the hearing.

Motsenbocker personally expressed his remorse for his commission of the charged offenses against Marshal Allie and for having "assaulted and stabbed" an inmate. With respect to the prison stabbing, Motsenbocker explained that he "was still in [his] addiction and fully immersed in [his] gang and criminal mentality and prison politics." Motsenbocker also stated that he was "no longer addicted to drugs or a gang member," and he worked "very hard to earn the reputation" that he now had with the staff and other inmates. Motsenbocker also noted that he was a certified mentor and drug counselor, and that these programs had changed his life and given him purpose. Motsenbocker's wife recounted Motsenbocker's transformation and explained that she would be able to financially support him upon his release from prison until he was able to gain employment.

In response, the People argued that there was sufficient evidence to believe Motsenbocker was at risk of committing a super strike. The People discussed the circumstances of the commitment offenses and the prison stabbing incident, as well as Motsenbocker's criminal history and previous poor performance on probation and parole. The People also referred to Motsenbocker's gang affiliation[6] and his drug usage.

After hearing the foregoing, the trial court issued its ruling. The court began by acknowledging the section 1172.1 presumption in favor of

---

6    The prosecutor argued that "even though it sounds like he has taken some of the gang tattoos off, it doesn't appear that there has been an official debrief and dropout." The Secretary's report lodged along within his recommendation states, "Motsenbocker has Security Threat Group information, specifically with the STG II, San Diego Skinheads."

resentencing, which it noted could be overcome only if the court were to find that there was an unreasonable risk that Motsenbocker would commit a super strike. The court also indicated that it had been "stewing on this for quite some time."

The court noted that it remembered the trial of the underlying offenses,[7] which the court stated involved "a very serious crime." The court also noted that Motsenbocker had a prior strike and had previously committed "other crimes." Turning to Motsenbocker's conduct in prison, the court stated that it "applaud[ed] [Motsenbocker] for all of the things that he has done over the last several years to rehabilitate himself," but that it was hard to "overlook the fact that [he] stabbed another inmate." The court observed that the stabbing was an "act of violence" that amounted to a "serious red flag." The court also noted that it was positive that Motsenbocker had "denounced his gang," and that he was "recovering from drugs," but observed that "we have no assurances at all that that is going to be done on the outside." The court added, "He is certainly headed in the right direction, but the [L]egislature[] ha[s] basically trusted this court to do an analysis and make a call as to whether or not he is going to be someone who commits serious felony crimes in the future. And based on what I have just talked about, I can't say that."

Ultimately, the court stated, "I think the defendant at 43 years old remains a threat to the public. And I don't say this lightly, because I applaud all that he has done over the past ten years, but I have to look at what he did before, did in this crime, and what he did afterwards. So based on that, I find

---

7    The record reflects that the trial judge was the same judge who presided over Motsenbocker's original trial, had imposed the initial sentence after the jury trial in 2013, and had resentenced him in 2016 pursuant to the parties' stipulation during habeas proceedings.

that the [P]eople have, in fact, overcome the presumption, and I will deny it on that." The trial court added that even if it were "to go back and resentence him," it would not impose a lesser sentence.

Immediately thereafter, noting the trial court's reference to "serious felony crimes," defense counsel asked the court to clarify whether it was "talking specifically about super strikes."

The trial court responded affirmatively and stated, "I should probably have clarified this." Thereafter, the court referred to Motsenbocker's criminal history, the circumstances of the commitment offenses, including that "he nearly killed a U.S. Marshall," and the fact that he had "nearly killed another inmate." The court concluded by stating: "I am specifically making a finding that he is a public safety threat based on his ability and desire at one point to kill a federal marshal and his desire at another point to kill an inmate. Again, you tried to kill two people. It's not hard to predict you may try to kill again in the future. So based on that, the defense motion is denied."

3. *Application*

We note at the outset that the trial court properly considered the presumption in favor of recall and resentencing under section 1172.1, subdivision (b)(2), and that the court complied with the statutory requirement specified in section 1172.1, subdivision (a)(7) that it state on the record its reasons for denying recall and resentencing. The record also reflects that the trial court carefully considered the Secretary's recommendation. The parties provided extensive briefing and argument and the court provided a detailed statement of its reasons for its decision.

14

The trial court also expressly noted that it had been "stewing" over the proper result and stated that it did not make its ruling "lightly."

Further, while the trial court acknowledged Motsenbocker's laudable efforts to rehabilitate himself, the court also reasonably considered numerous factors that weighed in favor of a finding that the presumption in favor of recall and resentencing had been rebutted in denying the Secretary's recommendation. Specifically, the court noted the seriousness and violent nature of one of the commitment offenses, Motsenbocker's prior commission of a strike and other criminal offenses, and his commission of a stabbing while in prison. The court also reasonably observed that Motsenbocker's efforts to recover from his drug addiction and end his involvement with gangs had not been tested outside of a custodial setting. These observations were particularly rational given that the record also reflects that Motsenbocker had previously failed to complete probation successfully on several occasions.

We are not persuaded by Motsenbocker's argument that reversal is required because "[c]ontrary to the trial court's statement, in the underlying case [he] was not charged with or accused of *intending* or desiring to kill the federal marshal," and that with respect to the prison stabbing incident that he "was not accused of attempted murder." Motsenbocker cites no authority, and we are not aware of any, holding that a court is not entitled to consider the record and make its own assessment of the nature of a defendant's prior criminal conduct in considering whether to recall his sentence under section 1172.1.

Further, even assuming strictly for the sake of this opinion that it was improper for the trial court to make these statements, the court did so only *after* explaining that it found that the presumption in favor of recalling Motsenbocker's sentence rebutted and having denied the Secretary's

15

recommendation and *after* having offered a lengthy explanation in support of this ruling. The court also stated that it would resentence Motsenbocker to the same sentence even if it were to recall the sentence. In short, even assuming the court erred in referring to its assessment of Motsenbocker's state of mind in committing the assault on Marshall Allie and the prison stabbing, it is clear beyond any reasonable doubt that the court would have found the presumption of recall and resentencing rebutted and denied the Secretary's recommendation even without such an assessment.

In sum, the record reflects both Motsenbocker's remarkable rehabilitative efforts while in prison and his prior serious and violent conduct involving firearms, other weapons, drugs, and gangs. After carefully considering the totality of the record, we agree that Motsenbocker appears to have made, as one CDCR officer aptly put it, a "remarkable transformation." We cannot, however, say that the trial court erred in finding that the presumption in favor of recall and resentencing had been overcome based on the ground that Motsenbocker continued to pose an unreasonable risk of danger to public safety under section 1172.1, subdivision (b)(2). We further conclude that the trial court did not act in an "arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*Gibson, supra,* 2 Cal.App.5th at p. 325.) Thus, even if other reasonable judges might have ruled differently, we conclude the trial court did not abuse its discretion in declining to recall Motsenbocker's sentence.

16

## DISPOSITION

The order denying recall of Motsenbocker's sentence is affirmed.


BUCHANAN, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DO, J.